# UNITED STATES DISTRICT COURT

_____ DISTRICT OF MASSACHUSETTS _____

UNITED STATES OF AMERICA

## CRIMINAL COMPLAINT

v.

M.J. No.: 04-849·MBB

JULIO DANIEL GRANDE
Calle 45 A # 2824 Apt. 301, Santa Fe, Bogota, Colombia

(Name and Address of Defendant)

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief. On or about August 2000 through April 2003 in Suffolk County, in the District of Massachusetts, defendant did

(1) knowingly and intentionally conducting financial transactions, including the laundering of drug proceeds, a specified unlawful activity, through a domestic account, with the intent to conceal and disguise the nature, location, source, ownership and control of the proceeds of said specified unlawful activity, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and (2) knowingly and intentionally engaging in a monetary transaction by and through or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, in violation of Title 18, United States Code, Section 1957.

I further state that I am a Special Agent of ICE Homeland Security and that this complaint is based on the following facts:

**Please see attached Affidavit of Special Agent Henry J. Basile**
Continued on the attached sheet and made a part hereof;    [x] Yes    [ ]No

Signature of Complainant
HENRY J. BASILE
Special Agent-Bureau of Immigration and
Customs Enforcement

Sworn to before me and subscribed in my presence,

May 26 , 2004 @ 4:20 PM    at    Boston, Massachusetts
Date                                City and State

MARIANNE B. BOWLER
**United States Magistrate Judge**    Marianne B. Bowler, USMJ
Name and Title of Judicial Officer    Signature of Judicial Officer

## AFFIDAVIT OF SPECIAL AGENT HENRY J. BASILE

I, Henry J. Basile, being duly sworn, hereby depose and state as follows:

1. I am a Special Agent with the U.S. Immigration and Customs Enforcement (ICE) (formerly U.S. Customs, Department of Treasury), Department of Homeland Security, and have been so employed for approximately twelve years. I am currently conducting a money laundering investigation as part of the New England HIDTA (high intensity drug trafficking area) Financial Task Force, a HIDTA Task Force consisting of United States ICE Agents, Internal Revenue Service (IRS), Criminal Investigation Agents, and Massachusetts State Police, the purpose of which is to investigate narcotics money laundering.

2. In my capacity as a Special Agent, I have participated in numerous narcotics money laundering investigations, during the course of which I have conducted physical and electronic surveillance, executions of search warrants, and reviewed numerous taped conversations and records of drug traffickers and money launderers. Through my training, education, and experience, I have become familiar with the manner in which the proceeds of narcotics trafficking are laundered and the efforts of persons involved in such activity to avoid detection by law enforcement. I have been the lead case agent on

1

numerous investigations involving the laundering of drug proceeds through structuring deposits into domestic bank accounts, as well as the lead case agent on numerous other money laundering investigations, including investigations involving the use of money orders, cashier's checks, bank checks and money remitters.

3. I submit this affidavit in support of a criminal complaint charging **JULIO DANIEL GRANDE** (hereinafter referred to as "GRANDE") with the following:

(a) during the period from at least April 2000 to November 2003, the defendant GRANDE did knowingly and intentionally conduct financial transactions, including the laundering of drug proceeds, a specified unlawful activity, through a domestic account, with the intent to conceal and disguise the nature, location, source, ownership and control of the proceeds of said specified unlawful activity, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

(b) the defendant did knowingly and intentionally engage in a monetary transaction by, through or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, in violation of Title 18, United States Code, Section 1957. In

2

particular, as discussed in more detail below, there is probable
cause to believe that GRANDE committed these crimes.

### SUMMARY OF PROBABLE CAUSE TO ARREST JULIO GRANDE:

(A) CW1 and CW2, discussed below, acting on behalf of
Juki Union, arranged for the sale of sewing machines to a
Colombian company, Mundo Maquinas;

(B) Mundo Maquinas paid this debt to CW1 and CW2 in
bulk cash, money orders and third party checks, consistent with
drug money purchased off the Black Market Peso Exchange ("BMPE");
some of these payments on behalf of Mundo Maquinas came from
GRANDE, a dentist affiliated with a dental supply company named
Cardent;

(C) CW1 and CW2 accepted 2 checks and a wire transfer
for a total of $25,000 from GRANDE; the 2 checks were received by
CW1 with additional third-party checks totaling $27,000 from a
sender unknown to CW1 and CW2; CW1 deposited the checks into the
USCL account, discussed below, an account which CW1 and CW2
admittedly used to launder money;

(D) These checks and the wire transfer were drawn from
GRANDE's personal account; analysis of GRANDE's personal account
revealed that approximately $365,000 was from deposited money
orders, a significant number of which were purchased in a
structured fashion consistent with money laundering techniques;

3

(E) CW2 stated that CW2 believed that these checks and wire transfer drawn from the GRANDE account were all drug proceeds purchased on the BMPE;

(F) There is no evidence that GRANDE or Cardent have any relationship with Mundo Maquinas such that they have reason to be paying Mundo Maquinas' debt;

(G) CW3, discussed below, identified $20,000 of the money orders deposited into the GRANDE account during this time period, as money orders he personally sold; these money orders were part of an approximately 1 million dollars in cash that CW3 received from individuals CW3 believed to be drug dealers; CW3 received approximately $20,000 to convert this cash to money orders; and

(H) Checks drawn off the Cardent account were deposited into the GRANDE account, and an analysis of the Cardent account demonstrates that numerous deposits into the Cardent account were approximately $518,000 in money orders, many purchased in a structured fashion consistent with money laundering techniques.

4. The information contained in this Affidavit is based upon facts and circumstances learned by me personally and related to me by other law enforcement officers involved in the investigation.  This Affidavit does not set forth all the facts developed during the course of this investigation.  Rather, it

4

sets forth only those facts that are necessary and sufficient to establish the requisite probable cause.

## CURRENCY REPORTING REQUIREMENTS

5. Domestic financial institutions are required by law and regulation to file a Currency Transaction Report (IRS Form 4789, hereafter referred to as a "CTR") with the Internal Revenue Service for each transaction in currency, such as a deposit, withdrawal, exchange of currency or other payment or transfer by, through or to a financial institution, in excess of $10,000. CTRs are filed with the Internal Revenue Service on forms which require, among other things, the identity of the individual who conducted the transaction and the individual or organization for whom the transaction was completed.

6. "Structuring" financial transactions means the breaking down of amounts of currency into amounts less than $10,000 prior to transacting business with one or more domestic financial institutions or businesses in an attempt to evade currency reporting requirements.

7. Structuring is one of the methods most frequently used by money launderers to launder their drug trafficking proceeds. Narcotics trafficking generates large amounts of currency. Structuring involves breaking up these large amounts of currency into amounts less than $10,000. Pursuant to Title 31, United States Code, Section 5324, structuring is a felony.

5

8. Domestic financial institutions are also required by law and regulation to maintain records (commonly referred to as a "log") in case of any sale or issuance of a money order, traveler's check, cashier's check or bank check which involves currency in amounts of $3,000 through $10,000 inclusive.  If the purchaser does not have a deposit account with the financial institution, the financial institution must obtain and maintain the following: the name and address of the purchaser, the social security number or alien identification number of the purchaser, the date of birth of the purchaser, the date of purchase, the types of instruments purchased, the serial numbers of the instruments purchased, and the amount in dollars of each of the instruments.  The financial institution must verify the purchaser's name and address by examination of a document which is normally acceptable in the banking community as a means of identification when cashing checks for nondepositors and which contains the name and address of the purchaser, such as a driver's license.

## MONEY LAUNDERING AND DRUG TRAFFICKING

9.  Money laundering is the term given to financial transactions which have as their purpose the concealment of funds which were generated by illegal activity, and the efforts undertaken to give those funds the appearance of legitimacy.

10. In the United States, the criminal activity which

6

generates the largest amount of illicit funds, and therefore, the largest amount of funds which require laundering, is drug trafficking.  Colombia is the world's largest cocaine producer, as well as a major producer of heroin.  The United States is the world's largest cocaine market.  Cocaine and heroin are smuggled into the United States and sold almost exclusively for cash. Thus, drug trafficking results in a vast amount of U.S. currency which must be laundered.

11.  In the case of drug trafficking, the money launderer plays an integral role because drug trafficking generates such a high volume of currency, mainly in small denominations.  This creates a problem for the trafficker because the bulk and weight of the currency makes it very difficult to transport and conceal.

12.  The money launderer's role is to take the money generated by trafficking and convert it to more easily concealable and transportable forms or to get the money into the banking system.

13.  The process of money laundering begins with the placement process, i.e. the initial placement of the currency into the banking system or the conversion of the currency into a form generated by the banking system, such as the purchase of money orders, bank checks, etc.

**MONEY LAUNDERING AND THE BLACK MARKET PESO EXCHANGE ("BMPE")**

7

14.   Money launderers and drug traffickers frequently use the service of money brokers to return drug proceeds to Colombia.  These brokers have developed a system to bypass the Colombian banking system and the scrutiny of Colombian authorities, and are able to deal directly with the narcotics traffickers who wish to sell their U.S. based drug dollars.  This system is known as the Black Market Peso Exchange ("BMPE").

15.   The process works as follows: a Colombian business person purchases goods for import into Colombia.  These goods must be paid for in dollars, as the exporter will not accept payment in pesos.  The Colombian business person purchases dollar denomination negotiable instruments from money brokers in Colombia.  These instruments include money orders, checks drawn on dollar accounts, wire transfers, or even cash.

16.   The broker obtains these negotiable instruments or cash by contracting with the drug traffickers or their representatives who have dollars, in the form of drug proceeds, in the United States.  The broker arranges for the drug proceeds to be picked up from the trafficker's U.S. representative and deposited into a bank account controlled by the broker or to be turned into other negotiable instruments, such as money orders and bank checks. The broker provides the business person with the dollar denomination instruments needed to pay the supplier, minus

8

the commission charged by the broker.  The broker pays the drug trafficker in Colombia in pesos, minus the commission charged by the broker.  In this fashion, the business person obtains the dollar denomination instruments needed to pay debts, and the trafficker obtains the pesos needed to operate the drug business, without bearing the responsibility of arranging for the movement of the drug dollars, and effectively laundering the drug proceeds through the broker's bank accounts.

17.  Different negotiable instruments command different prices on the black market.  The variation in price is directly related to market conditions, availability of a particular instrument, and the risks associated with the instrument.

18.  The Colombian business person resorts to the black market because the cost of purchasing dollars on the black market is substantially less than the cost of purchasing dollars from the Colombian Central Bank.  If the Colombian importer goes to the Central Bank to purchase dollars, the importer is asked why the dollars are needed.  In Colombia, there are import duties on most products; duties range from 7% to 25% of the cost of the import.  The Central Bank collects that duty on behalf of the government at the time the dollars are purchased.  The Central Bank also collects a 6% tax on the purchase of foreign currency on behalf of the government.  Thus, the importer must pay anywhere from 13% to 31% to purchase U.S. currency.  Because no

9

import duty or tax is imposed by the money broker, the cost of purchasing currency on the black market is substantially less. Thus, with rare exceptions, businesses will use the black market to purchase dollars when paying for imports.

19.   Brokers must employ a variety of individuals to effect the money laundering process. Some individuals are used as "pickup" people, i.e., people responsible for collecting the drug proceeds from the street sales and dropping them off at "stash houses." Other individuals are used to maintain "stash houses," where the drug proceeds are stored prior to laundering. Others, with access to bank accounts, are used to structure deposits of currency into accounts or to purchase money orders and other instruments.

20.   My investigation demonstrates that GRANDE is using bank accounts and complex, convoluted transactions through these accounts, to conceal illegally derived funds.

## MONEY LAUNDERING THROUGH THE USE OF BANK ACCOUNTS

21.   Money laundering through the use of bank accounts is a common, well-established technique. These accounts are most often opened as personal checking accounts by persons acting at the direction of the Colombian money broker, who is the true owner and manager of the funds.

22.   Once the accounts are opened, the money broker must arrange for the drug proceeds to be placed into the

10

accounts.   This is typically done through the process of, first, arranging for the drug proceeds to be delivered to the money launderers and, second, arranging for the deposit of these funds into the accounts.   The deposit of the funds is almost always done through structuring, though, as detailed below, the structuring is not always obvious on its face.   Typically, a low level individual, often referred to as a "smurf," makes the deposits, as follows.   Typically, structured deposits are made in amounts of just under $10,000 to avoid the mandatory CTR filing obligation that a financial institution, such as a bank, has. These structured deposits are made frequently, with multiple deposits often made on a single day soon after the illegal proceeds are received.   The deposits are often made in different branches to the same bank account.   To avoid detection, money launderers have more recently begun to substantially lower the average structured dollar amount to amounts between $1,000 and $4,000, with between five and ten deposits per month.

     23.   Once the placement is complete, the broker knows the exact amount of funds in each account.   The broker can now sell checks to his/her clients.   The broker simply fills in a monetary amount on the signed check, leaving the payee section blank.   The business person purchasing the check simply fills in the payee section with the name of the business (or person) to whom the business person is indebted.   Even though the result of

11

this financial arrangement involves individuals or businesses who are removed from the drug sales, the initial stage of this money laundering process is the sale of illegal drugs in the United States.  In fact, the money laundering process is designed to conceal the origin of the funds as drug proceeds.

24.  The checks are often drawn in amounts similar to the amounts of the deposits, almost exclusively in round dollar amounts.  The payee on the checks most often is a company unrelated to the account holder and located outside Colombia.  If the payee is domestic, the payee is most often a company located in Florida, New York, or Houston, cities with companies which do a large volume of business with Colombia.

### MONEY LAUNDERING AND THE USE OF MONEY ORDERS

25.  The current investigation demonstrates that GRANDE is not only laundering illegal proceeds in the form of checks but also illegal proceeds in the form of money orders.

26.  Money laundering through the use of money orders is another common, well-established technique.  Typically, this scheme operates as follows: after picking up drug currency at the instruction of the money broker, the broker's employees in the United States will begin to purchase money orders.  The employees will go from one money order seller to the next in a geographic area, including the U.S. Postal Service, which also sells money orders.  Each employee will purchase no more than $3000 in money

12

orders at any one location, and will usually purchase between
$2500 and $3000 at a location.  This is done so as to avoid
having to produce identification, pursuant to the log requirement
referred to above.

27.   The money orders are often purchased at maximum
face value; for the Postal Service, this means $700 increments,
and for most other money order sellers, this means $500.

28.   The current investigation demonstrates probable
cause that GRANDE is money laundering illegal proceeds, by having
these proceeds in the form of money orders deposited in his
account and converting them into the form of wire transfers or
checks.

### TRANSFERS FROM THE GRANDE ACCOUNT TO KNOWN MONEY LAUNDERING ACCOUNTS

29.   In January of 2004, a cooperating witness (CW1)
pled guilty to violations of conspiracy to money launder pursuant
to 18 U.S.C. § 1956(h), engaging in monetary transactions in
property derived from a specified unlawful activity pursuant to
18 U.S.C. § 1957, and structuring pursuant to 31 U.S.C. § 5324.
On May 19, 2004, a second cooperating witness (CW2), pled guilty
to conspiracy to commit money laundering pursuant to 18 U.S.C. §
1956 and engaging in monetary transactions in property derived
from specified unlawful activity pursuant to 18 U.S.C. § 1957.

30.   CW1 and CW2 have provided information to me
regarding their involvement in the laundering of narcotics

13

proceeds through the Colombian Black Market Peso Exchange ("BMPE"). CW1 and CW2 are cooperating with the hope of obtaining a reduced sentence in their federal cases. The information provided to me by CW1 and CW2 proved to be reliable and has been corroborated by evidence obtained during the investigation. CW1 and CW2 are involved in purchasing industrial sewing machines in the United States and shipping these goods to Colombia through their company Universal De Suministros. Universal De Suministros is a family company of CW2 that distributes industrial sewing machines to Colombia on behalf of a company, Juki Union Special, whose headquarters is in Miami, Florida.

31. CW1 lived and worked in Dracut, Massachusetts, during the time at issue, April 2000 through November 2003. CW2 lived and worked in Cali, Colombia, during the time at issue. CW1 and CW2 arranged for and accepted at least $360,000 from Mundo Maquinas, another Colombian Company. Mundo Maquinas owed CW1 and CW2 at least $360,000 for goods which were purchased from Juki Union Special through CW1 and CW2.

32. CW2 stated that initially Mundo Maquinas paid CW1 and CW2 direct wire transfers from Mundo Maquinas in Colombia, but later Mundo Maquinas paid through bulk cash, money orders, and third-party checks, meaning checks written by others not affiliated with Mundo Maquinas. CW1 and CW2 stated that they believed that the cash and money orders were narcotics proceeds,

14

given that familiarity with the Colombian BMPE and the manner in
which they were given these large amounts of cash and money
orders.  CW2 stated that when Mundo Maquinas stopped paying its
$360,000 debt through direct wire transfers from Mundo Maquinas
in Colombia, CW2 believed that Mundo Maquinas was buying drug
dollars in the form of not only the above-referenced cash and
money orders, but also the checks and any wire transfers from
unknown individuals, from the Colombian Black Market to pay the
debt.

        33.  The Mundo Maquinas debt paid in what CW2 believed
to be narcotics proceeds, included at least $25,000 in third-
party checks and a wire transfer that were drawn from GRANDE's
personal account, discussed more fully below.  Both CW1 and CW2
stated that GRANDE was an individual unknown to them.

        34.  CW2 would deal directly with Mundo Maquinas and
arrange for CW1's receipt of the cash, money orders, and checks.
CW1 would then make the deposits into CW1 and CW2's joint
accounts in banks in Massachusetts and then transfer this money
to pay off third-party Colombian business debt, namely Mundo
Maquinas' debt, consistent with the BMPE.  Based on CW2's
discussions with representatives from Mundo Maquinas such as
Liliana Lopez and Alirio Chacon, CW2 would instruct CW1 when CW1
was to receive the cash, money orders, or checks as payment for
Mundo Maquinas' debt.  CW2 would also instruct CW1 to deposit the

15

money into the accounts discussed below and then CW2 would instruct CW1 where to wire the money after deposit or where to issue checks and in what amount.

35.  During the course of this investigation, I have obtained and reviewed records for the following two Sovereign Bank accounts opened jointly by CW1 and CW2 that were used for the above-referenced cash and money order deposits:

Account #30900001923
USCL Inc.                    (hereinafter "USCL" account)
75 C Street
Dracut, MA 01826

Account #3090015598
Claudia NAVARRO-MONTERO (hereinafter "NAVARRO" account)
D/B/A Universal De Suministros
552 North Avenue
Weston, MA 02493

36.  On or about August 16, 2000, the USCL Account was opened, and the updated signature sheet on December 29, 2000, is signed by CW1 and CW2.  On the corporate authorization resolution at the Sovereign Bank for USCL, Inc., CW1 is listed as the President and CW2 is listed as the Treasurer and Clerk.  CW1 and CW2 are also listed as the only Directors of the company.  CW1 is named as the Incorporator of the company.  Bank documents list USCL as being involved with "sugar equipment sales."

37.  On or about July 22, 2000, CW1 and CW2 opened up the NAVARRO account entitled Claudia NAVARRO-MONTERO dba Universal De Suministros (hereafter referred to as the "NAVARRO

16

account"), 552 North Avenue, Weston, MA at the Sovereign Bank.
Both the USCL account and the NAVARRO account are joint business
checking accounts in which only CW1 and CW2 have signature
authority.  Therefore, only CW1 and CW2 have the authority to
write checks out of these accounts.

         38.   CW1 and CW2 admitted to me that the USCL account
and the NAVARRO accounts were used for money laundering activity.

         39.   During a one week period in the end of May 2001
and the beginning of June 2001, CW1 structured at least $80,000
cash into the USCL account and NAVARRO account.  CW1 admitted to
me that CW1 structured this cash into deposit amounts under
$10,000 in an attempt to avoid the bank's Currency Transaction
Reporting requirement.  CW1 and CW2 stated to me that this
$80,000 was money paid on behalf of Mundo Maquinas.  Both CW1 and
CW2 stated, based on their involvement in and understanding of
the Colombian BMPE, that it was their belief that this cash was
narcotics proceeds purchased by Mundo Maquinas through the BMPE.

**NARCOTICS PROCEEDS LAUNDERED THROUGH CW3 AND DEPOSITED INTO THE
USCL, NAVARRO, AND GRANDE ACCOUNTS**

         40.   During the course of this investigation, I was
able to determine that the following bulk money orders that CW1
deposited into the USCL, NAVARRO, and GRANDE accounts were
purchased by known drug dealers.  I subpoenaed Western Union
records and determined that the below-listed money orders were

                                   17

purchased from Triboro Check Cashing, 41-22 Greenpoint Avenue, Sunnyside, NY.    Analysis of the serial numbers show that the money orders were purchased at the same time and place.    For example, as to the money orders deposited by CW1 into the USCL or NAVARRO accounts, 25 money orders were purchased together, as is shown by the consecutive serial numbers 06-2609367881 through 06-260936905.    CW1 and CW2 stated to me that these money orders were payment from Mundo Maquinas.    Both CW1 and CW2 stated that they believed that these money orders were narcotics proceeds purchased through the BMPE by Mundo Maquinas.    On April 23, 2001, CW1 deposited the following into the NAVARRO Account:

| Date | Money Order # | Agent# | Amount |
|------|---------------|--------|--------|
| 04/06/01 | 06-260936873 | 162165 | $854.62 |
| 04/06/01 | 06-260936876 | 162165 | $956.23 |
| 04/06/01 | 06-260936881 | 162165 | $852.30 |

On April 23, 2001, two separate money order deposits were made into the USCL account in the amounts of $8,147.02 and $9,190.62, as follows:

| Date | Money Order # | Agent# | Amount |
|------|---------------|--------|--------|
| 04/06/01 | 06-260936874 | 162165 | $879.56 |
| 04/06/01 | 06-260936875 | 162165 | $854.23 |
| 04/06/01 | 06-260936877 | 162165 | $245.62 |
| 04/06/01 | 06-260936882 | 162165 | $265.89 |
| 04/06/01 | 06-260936883 | 162165 | $365.90 |
| 04/06/01 | 06-260936884 | 162165 | $658.93 |
| 04/06/01 | 06-260936885 | 162165 | $541.30 |
| 04/06/01 | 06-260936886 | 162165 | $852.30 |
| 04/06/01 | 06-260936887 | 162165 | $235.69 |
| 04/06/01 | 06-260936888 | 162165 | $658.93 |
| 04/06/01 | 06-260936889 | 162165 | $321.03 |
| 04/06/01 | 06-260936890 | 162165 | $658.92 |

18

| 04/06/01 | 06-260936891 | 162165 | $456.89 |
| 04/06/01 | 06-260936892 | 162165 | $658.93 |
| 04/06/01 | 06-260936893 | 162165 | $325.69 |
| 04/06/01 | 06-260936894 | 162165 | $954.62 |
| 04/06/01 | 06-260936895 | 162165 | $325.69 |
| 04/06/01 | 06-260936896 | 162165 | $987.45 |
| 04/06/01 | 06-260936897 | 162165 | $856.23 |
| 04/06/01 | 06-260936898 | 162165 | $894.56 |
| 04/06/01 | 06-260936899 | 162165 | $854.23 |
| 04/06/01 | 06-260936900 | 162165 | $745.62 |
| 04/06/01 | 06-260936901 | 162165 | $265.89 |
| 04/06/01 | 06-260936902 | 162165 | $900.56 |
| 04/06/01 | 06-260936903 | 162165 | $587.96 |
| 04/06/01 | 06-260936904 | 162165 | $895.62 |
| 04/06/01 | 06-260936905 | 162165 | $445.40 |

### COOPERATING WITNESS 3 ("CW3")

41.   CW3 is a third cooperating witness who worked at Triboro Check Cashing, Inc. in 2001. CW3 was arrested for violations of money laundering in violation of 18 § USC 1956 in New York. CW3 is cooperating in the hopes of obtaining a reduction of sentence. CW3's information has proven reliable and has been corroborated during this investigation. CW3 has provided information to me during interviews and has positively identified the above listed money orders that were deposited into the USCL and NAVARRO accounts and the below-listed money orders that were deposited into the GRANDE account as those sold from Triboro Check Cashing to two Colombian Nationals named "Maria" and "Gustavo". CW3 stated to me that this couple would bring CW3 upwards of $40,000, $50,000, or $60,000 dollars in bulk cash to be converted by CW3 into money orders at a time. CW3 also stated that the money would always be in small denominations and wrapped

19

in bundles.  CW3 recalled that on one occasion, the couple
brought CW3 bulk cash, all in one dollar bill denominations.

42.  CW3 stated to me that CW3 would issue the money
orders in odd denominations rather than even dollar amounts to
avoid suspicion.  CW3 sold the money orders to the couple and
never required identification as required by law.  During one
meeting with "Maria" and "Gustavo", CW3 told them that they where
bringing a lot of money and he did not want to sell them anymore
money orders unless they would agree to pay him a 2% commission.
The couple agreed.  "Gustavo" told CW3 that in the future they do
not want to mention dollar amounts on the phone.  They told CW3
that they would use coded language when referring to the money
they would bring to him.  The couple told CW3 that the word
"sandwich" would be used to refer to $10,000.  CW3 told me that
CW3 continued to sell money orders to "Maria" and "Gustavo" and
was paid 2% of the amount CW3 would sell them.

43.  Due to their use of coded language and the large
amounts, denominations and frequency of the money they were
bringing him, CW3 believed that they had a drug business and that
the money was drug money.  CW3 came to this conclusion after
approximately 4 months of doing business with "Maria" and
"Gustavo".  CW3 sold money orders to them for approximately one
(1) year. During that time, CW3 sold them at least one (1)

20

million dollars in money orders and made at least twenty thousand dollars in commission.

### THE GRANDE ACCOUNT

44. Deposits into the USCL account also included funds that originated from Account Number 1401919417 at the City National Bank under the name Julio Daniel GRANDE (the "GRANDE account"). I analyzed the GRANDE account records. The GRANDE account is a personal checking account opened in Miami, Florida. GRANDE had sole control of the account because he is the only individual who has signature authority over the account. The signature sheet shows that on April 21, 2000, this account was opened by Julio Daniel GRANDE, DOB: 11/14/1955, with an address listed as 2822 NW 79 Ave., Miami, FL 33122. The banks records list a permanent address for GRANDE as Calle 45 A # 2824 Apt. 301, Santa Fe, Bogota, Colombia. GRANDE has stated that he is a dentist. Bank records also list his employer as Cardent International, which is located at 2822 NW 79th Avenue, Miami, FL 33122.

45. On August 30, 2002, GRANDE arrived in Miami, Fl from Colombia aboard Avianca Flight 4. GRANDE was the subject of a secondary Customs inspection and told Inspectors that he was employed as a dentist in Colombia. He told Inspectors that he was scheduled to travel to Nicaragua, Guatemala, Santo Domingo and Honduras to teach dentistry. GRANDE stated that Cardent

21

International was paying for his trip. Cardent is listed in the
U.S. Business Directory and on its website as a medical supply
company.

46. During the period of October 2001 through to
November 2001, over $25,000 was transferred from the GRANDE
account to the USCL account. These funds from the GRANDE
Account, deposited into the USCL account, consisted of two checks
dated October 19, 2001, in the amounts of $6,379.79 and $6,220.21
respectively, made out to USCL, Inc., along with a wire transfer
dated November 5, 2001, in the amount of $12,600 for a total of
$25,200. On or about October 18, 2001, CW1 received a DHL
package of checks for $27,000, including these 2 GRANDE checks,
which CW2 stated were all payment for Mundo Maquinas. These
checks were sent by a sender unknown to CW1 and CW2. CW2
believed these checks and the wire transfer were drug dollars
purchased through the BMPE.

47. My analysis of the two checks drawn on the GRANDE
account and paid to USCL, Inc. show that the checks appear to be
signed by GRANDE. I compared the signature on the checks and
they match the signature on GRANDE'S driver's license, passport,
and the signature card from the bank records.

48. CW1 and CW2 stated to me that they never had any
direct dealing with GRANDE. There is also no apparent connection
between GRANDE and Mundo Maquinas such that GRANDE would be

22

paying Mundo Maquinas' debt.  As discussed above, CW2 stated
that, based on her communications with representatives from Mundo
Maquinas, CW2 would direct CW1 when to expect payment from Mundo
Maquinas and in what form.  CW1 received numerous bulk money
orders and checks in envelopes from sender individuals unknown to
CW1 and CW2 as payment for Mundo Maquinas.

        49.   My analysis of the GRANDE account also indicates
that from April 21, 2000, through October 20, 2003, approximately
$560,000 was deposited into this account.  These deposits mostly
consisted of money orders that totaled approximately $365,000.
Many of these money orders were purchased and deposited in a
manner similar to activity consistent with the BMPE.  As
discussed above, CW3 has positively identified the following
money orders that were deposited into the GRANDE account as those
sold by him from Triboro Check Cashing to the two Colombian
nationals named "Maria" and "Gustavo", who regularly brought bulk
cash in small denominations to CW3 and who CW3 believed were in
the business of drug dealing:

**April 24, 2001 - Date of Deposit**

| Date | Money Order # | Agent # | Amount |
|------|---------------|---------|--------|
| 04/06/01 | 06-260936835 | 162165 | $852.36 |
| 04/05/01 | 06-260460729 | 142993 | $802.50 |
| 04/05/01 | 06-260460777 | 142993 | $759.60 |
| 04/05/01 | 06-260460756 | 142993 | $744.35 |
| 04/05/01 | 06-260460715 | 142993 | $735.88 |
| 04/05/01 | 06-260460731 | 142993 | $701.28 |
| 04/06/01 | 06-260936826 | 162165 | $245.03 |
| 04/05/01 | 06-260460774 | 142993 | $115.25 |

23

```
04/05/01      06-260460737          142993        $100.00
```

**April 25, 2001 – Date of Deposit**

| Date | Money Order # | Agent # | Amount |
|------|---------------|---------|--------|
| 04/05/01 | 06-260460788 | 142993 | $115.00 |
| 04/05/01 | 06-260460782 | 142993 | $775.30 |
| 04/05/01 | 06-260460752 | 142993 | $779.60 |
| 04/05/01 | 06-260460730 | 142993 | $197.50 |
| 04/05/01 | 06-260460751 | 142993 | $220.40 |
| 04/05/01 | 06-260460783 | 142993 | $224.70 |
| 04/05/01 | 06-260460776 | 142993 | $240.40 |
| 04/05/01 | 06-260460789 | 142993 | $885.00 |
| 04/05/01 | 06-260460708 | 142993 | $735.12 |
| 04/05/01 | 06-260460738 | 142993 | $900.00 |

**April 26, 2001 – Date of Deposit**

| Date | Money Order # | Agent # | Amount |
|------|---------------|---------|--------|
| 04/06/01 | 06-260936842 | 162165 | $213.65 |
| 04/06/01 | 06-260936840 | 162165 | $212.54 |
| 04/06/01 | 06-260936822 | 162165 | $214.53 |
| 04/06/01 | 06-260936844 | 162165 | $214.50 |
| 04/06/01 | 06-260936823 | 162165 | $214.79 |
| 04/05/01 | 06-260460760 | 142993 | $800.00 |
| 04/06/01 | 06-260936843 | 162165 | $524.23 |
| 04/05/10 | 06-260460736 | 142993 | $769.85 |
| 04/06/01 | 06-260936829 | 162165 | $542.33 |
| 04/05/01 | 06-260460778 | 142993 | $540.20 |
| 04/05/01 | 06-260460742 | 142993 | $528.79 |

**April 27, 2001 – Date of Deposit**

| Date | Money Order # | Agent # | Amount |
|------|---------------|---------|--------|
| 04/05/01 | 06-260460761 | 142993 | $250.00 |
| 04/05/01 | 06-260460775 | 142993 | $884.75 |
| 04/06/01 | 06-260936820 | 162165 | $854.62 |
| 04/05/01 | 06-260460706 | 142993 | $528.79 |
| 04/05/01 | 06-260460762 | 142993 | $750.00 |
| 04/05/01 | 06-260460727 | 142993 | $735.88 |
| 04/06/01 | 06-260936837 | 162165 | $210.36 |
| 04/05/01 | 06-260460759 | 142993 | $200.00 |

```
04/06/01    06-260936839           162165    $213.00
04/05/01    06-260460735           142993    $230.15
```

50.    My analysis of the checks drawn on the GRANDE
account additionally show that they all appear to be signed by
GRANDE.  The checks made payable are usually written in even
dollar amounts and sometimes multiple checks are written to the
same individual on the same day.  This activity is consistent
with someone who would be selling BMPE dollars to individuals in
the form of checks.  For example on August 22, 2001, the
following checks were written:

| Date | Check # | Payee | Amount |
|------|---------|-------|--------|
| 08/22/01 | 1009 | Nicolas Lugo | $950.00 |
| 08/22/01 | 1010 | Hernando Lugo | $950.00 |
| 08/22/01 | 1011 | Nicolas Lugo | $950.00 |
| 08/22/01 | 1012 | Hernando Lugo | $950.00 |

51.  Another example on October 9, 2001, the following
checks were written:

| Date | Check # | Payee | Amount |
|------|---------|-------|--------|
| 10/09/01 | 1026 | Ivan Guerrero | $5,785.00 |
| 10/09/01 | 1027 | Ivan Guerrero | $6,215.00 |

## THE CARDENT ACCOUNT

52.  In addition, there have been numerous checks from
Cardent that were deposited into the GRANDE account.  These
checks were drawn from Union Planters Bank of Miami, account

25

number 0025135705, in the name of Cardent International, Inc.,
with address 2822 NW 79 Ave., Miami, Florida.

    53.   I analyzed the Cardent account records for the
period June 5, 2001 through February 28, 2002.  My analysis
indicates that approximately $3.37 million was deposited into
this account.  Among the items deposited into this account were
numerous money orders that totaled approximately $518,000.  Many
of these money orders were also purchased and deposited in a
manner similar to that which was described above for the money
orders deposited into the USCL and GRANDE bank accounts.  The
activity described above shows how funds being used to allegedly
conduct business in sewing machines (USCL Account) are being sent
from the bank accounts of a medical supply company (Cardent
Account) and a dentist (Grande Account).  The activity described
above also shows that structured money orders and cash deposits
are not only made into the USCL account directly, but also into
accounts that transfer money to the USCL account.  This activity
is consistent with complex account transactions designed to
launder money and consistent with the Colombian Black Market Peso
Exchange.

    54.   Through my experience as an ICE Special Agent who
has conducted money laundering investigations utilizing the BMPE,
I believe there is probable cause to believe that GRANDE is using

the GRANDE account to launder drug dollars purchased from the
Colombian Black Market based on factors including the following:

(A) GRANDE is a Colombian national and dentist, working for a
dental company, Cardent International;

(B) GRANDE is in control of a United States bank account, the
GRANDE account, from which CW1 and CW2 stated that they received
payments for Mundo Maquinas debt, payments that CW2 believed were
narcotics proceeds being sold on the BMPE;

(C) GRANDE's account consists of deposits of numerous money
order deposits, including money orders which have been identified
by CW3 as cash CW3 converted to money orders for individuals he
believed to be drug dealers; and

(D) the GRANDE account activity, based on my experience, such
as the volume of the money order deposits, the manner in which
the checks were drawn on the account, and the money orders
purchased in a structured fashion consistent with money
laundering techniques.

55.   Based on all of the above, I believe there is
probable cause to believe that defendant JULIO DANIEL GRANDE is
laundering drug proceeds through the use of the Colombian Black
Market Peso Exchange (BMPE) and conducted financial transactions
designed to conceal the illegal nature of the proceeds in
violation of Title 18, United States Code, Section 1956 and
engaged in a monetary transaction by through or to a financial

27

institution, affecting interstate and foreign commerce, in

criminally derived property of a value greater than $10,000, in

violation of Title 18, United States Code, Section 1957.

Dated: May  , 2004
       Boston, MA

_____
Henry J. Basile
Special Agent
U.S. Immigration and
Customs Enforcement


Sworn to before me this
26th day of May 2004.

_____
MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS

28

JS 45 (5/97) - (Revised USAO MA 1/15/04)

**Criminal Case Cover Sheet**                    **U.S. District Court - District of Massachusetts**

**Place of Offense:** Massachusetts    **Category No.** _____    **Investigating Agency** CUSTOMS

**City** Dracut                          **Related Case Information:**

**County** Middlesex          Superseding Ind./ Inf. _____    Case No. _____
                              Same Defendant _____ New Defendant _____
                              Magistrate Judge Case Number    03-MJ-00886-MBB
                              Search Warrant Case Number    _____
                              R 20/R 40 from District of    _____

**Defendant Information:**

Defendant Name  Julio Daniel Grande                Juvenile    ☐ Yes    ☒ No

Alias Name _____

Address    Calle 45 A # 2824 Apt. 301, Santa Fe, Bogota, Colombia

Birth date (Year only): 1955  SSN (last 4 #): _____ Sex M Race: _____ Nationality: Colombian

**Defense Counsel if known:** _____    **Address:** _____

**Bar Number:** _____

**U.S. Attorney Information:**

AUSA  Cynthia W. Lie                **Bar Number if applicable** _____

Interpreter:    ☒ Yes ☐ No        List language and/or dialect:        Spanish

Matter to be SEALED:    ☒ Yes    ☐ No

        ☒ Warrant Requested        ☐ Regular Process        ☐ In Custody

**Location Status:**

**Arrest Date:** _____

☐ Already in Federal Custody as _____ in _____ .
☐ Already in State Custody _____ ☐ Serving Sentence ☐ Awaiting Trial
☐ On Pretrial Release:  Ordered by _____ on _____

**Charging Document:**    ☒ Complaint    ☐ Information    ☐ Indictment

**Total # of Counts:**    ☐ Petty _____ ☐ Misdemeanor _____ ☒ Felony  2

Continue on Page 2 for Entry of U.S.C. Citations

☒    I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are accurately set forth above.

Date: 05/26/04        Signature of AUSA: _____

JS 45 (5/97) - (Revised USAO MA 3/25/02) Page 2 of 2 or Reverse

**District Court Case Number** (To be filled in by deputy clerk): _____

**Name of Defendant**    Julio Daniel Grande _____

## U.S.C. Citations

| Index Key/Code | Description of Offense Charged | Count Numbers |
|---|---|---|
| Set 1  Money Laundering | 18 U.S.C. § 1956(a)(1)(B)(i) | 1 |
| Set 2  Engaging in Monetary Trans. | 18 U.S.C. § 1957 | 2 |
| Set 3 | | |
| Set 4 | | |
| Set 5 | | |
| Set 6 | | |
| Set 7 | | |
| Set 8 | | |
| Set 9 | | |
| Set 10 | | |
| Set 11 | | |
| Set 12 | | |
| Set 13 | | |
| Set 14 | | |
| Set 15 | | |

**ADDITIONAL INFORMATION:** _____

_____

_____

Grande JS45.wpd - 1/15/04 (USAO-MA)